```
 1                    UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF TEXAS
 2                          SHERMAN DIVISION

 3     UNITED STATES OF AMERICA      |  DOCKET 4:21-CR-253(2)
                                     |
 4                                   |  JULY 23, 2024
       VS.                           |
 5                                   |  4:12 P.M.
                                     |
 6     IRABOR FATARR MUSA            |  SHERMAN, TEXAS

 7     ---------------------------------------------------------

 8               VOLUME 1 OF 1, PAGES 1 THROUGH 48

 9          REPORTER'S TRANSCRIPT OF SENTENCING HEARING

10         BEFORE THE HONORABLE AMOS L. MAZZANT, III,
                  UNITED STATES DISTRICT JUDGE
11     ---------------------------------------------------------

12

13
       APPEARANCES:
14
       FOR THE GOVERNMENT:     HEATHER HARRIS RATTAN
15                             U.S. ATTORNEY'S OFFICE - PLANO
                               101 E. PARK BOULEVARD, SUITE 500
16                             PLANO, TX 75074

17
       FOR THE DEFENDANT:      JOHN WILLIAM HOPPING
18                             THE HOPPING LAW GROUP, PC
                               15950 NORTH DALLAS PKWY, SUITE 400
19                             DALLAS, TX 75248

20
       COURT REPORTER:         CHRISTINA L. BICKHAM, CRR, RDR
21                             FEDERAL OFFICIAL REPORTER
                               101 EAST PECAN
22                             SHERMAN, TX 75090

23

24
           PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
25       TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
```

```
 1              (Open court, Defendant present.)

 2              (REPORTER'S NOTE:  Material read into the record

 3    is transcribed verbatim and, therefore, may not reflect an

 4    exact quote from documents or exhibits.)

 5              THE COURT:  Okay.  The next case is 4:21-cr-253,

 6    the second defendant, United States of America versus

 7    Mr. Musa.

 8              THE DEFENDANT:  Yes, sir.

 9              THE COURT:  And for the Government?

10              MS. RATTAN:  Heather Rattan for the United States,

11    your Honor.

12              THE COURT:  And for the Defendant?

13              MR. HOPPING:  John Hopping for the Defendant.

14              THE COURT:  Make sure you turn the mic on.  We got

15    that appearance.

16              Did you get that, Chris?

17              MR. HOPPING:  John Hopping for the Defendant,

18    Irabor Musa.

19              THE COURT:  Maybe -- is it still -- maybe it's

20    lost power.

21              MR. HOPPING:  John Hopping for the Defendant,

22    Irabor --

23              THE COURT:  It's still not on yet, or he's lost

24    power so -- we're having one of those days.

25              MR. HOPPING:  John Hopping for the Defendant,
```

 1    Irabor Musa.

 2              THE COURT:  It's on red.

 3              MR. HOPPING:  I'm starting to think it's me.

 4              THE COURT:  It might be, Mr. Hopping.

 5              MR. HOPPING:  John Hopping for the Defendant,

 6    Irabor Musa.

 7              MR. JAY COMBS:  You're pushing the button when

 8    you're talking, and that turns it off.  Just press it once.

 9              MR. HOPPING:  Oh, then it is me.

10              THE COURT:  I think we already knew that,

11    Mr. Hopping, that it was you.  You're not the first one

12    that's had trouble, but you may be the longest to get it

13    right.

14              MR. HOPPING:  Not a good start.

15              John Hopping for the Defendant, Irabor Musa.

16              THE COURT:  Mr. Musa, don't worry.  This won't

17    affect anything with the sentencing.

18              Okay.  And then, Mr. Musa, you are here for your

19    sentencing pursuant to your final presentence report that

20    was filed on June 4th, 2024.  Have you had a chance to

21    review that, sir?

22              THE DEFENDANT:  Yes, your Honor.

23              THE COURT:  Have you had a chance to discuss it

24    with your counsel?

25              THE DEFENDANT:  Yes, your Honor.

```
 1              THE COURT:  And do you understand it?

 2              THE DEFENDANT:  Yes, your Honor.

 3              THE COURT:  And do you believe the report

 4   adequately covers your background?

 5              THE DEFENDANT:  Yes, your Honor.

 6              THE COURT:  And other than the objections filed,

 7   are you satisfied with the accuracy of the report?

 8              THE DEFENDANT:  Yes, your Honor.

 9              THE COURT:  Okay.  And, Mr. Hopping, have you had

10   the chance to review the final presentence report with your

11   client, and do you believe he understands it?

12              MR. HOPPING:  He does, your Honor.

13              THE COURT:  And do you have any comments,

14   additions, or corrections other than the objections?

15              MR. HOPPING:  No, your Honor.

16              THE COURT:  And on behalf of the Government,

17   Ms. Rattan, any comments, additions, or corrections?

18              MS. RATTAN:  No, your Honor.

19              THE COURT:  And then the Government filed no

20   objections?

21              MS. RATTAN:  That's correct.  We did not.

22              THE COURT:  Okay.  And, Mr. Hopping, are you still

23   pursuing all these objections?

24              MR. HOPPING:  Yes, your Honor.

25              THE COURT:  Okay.  Well, let's get started, then.
```

1           Okay.  Your first objection is you wanted to

2    clarify that he has two dependent children.

3           MR. HOPPING:  Yes, your Honor.  I believe the PSR

4    clarifies that -- the descriptor is "dependent."  The

5    PSR --

6           THE COURT:  Speak into the microphone.

7           MR. HOPPING:  The PSR used his only minor child.

8    His oldest daughter is in medical school right now, still

9    being supported by the parents and claimed as a dependent

10   on their tax returns.

11          THE COURT:  Okay.  Well, I'm not going to make a

12   change.  I just don't think that's necessary.  It doesn't

13   affect anything, but I understand that point.

14          Okay.  And then your next objection is how long he

15   was the leader or a zonal leader of the Black Axe group?

16          MR. HOPPING:  Yes, your Honor.  We provided the

17   Court, in our amended answer to the final PSR, his

18   resignation letter as a Black Axe member and as a leader,

19   dated September 30th of 2017.  And I believe that's

20   Exhibit A of the Amended Response to the Final PSR.

21          THE COURT:  So you disagree that he was replaced

22   when he lost an election, which was later in 2021, which is

23   what Probation is indicating?

24          MR. HOPPING:  Is that a question to me?

25          THE COURT:  Probation indicates that, you know, he

1   was the leader -- the zonal leader until early 2021, until

2   he lost an election at that point.  So that's what I'm

3   asking, Mr. Hopping.

4           MR. HOPPING:  Oh, yes, your Honor.

5           No, he resigned in 2017 from the organization and

6   as a leader.  The zonal -- or the Dallas Zone, it's my

7   understanding that was disbanded until 2021, until Kingsley

8   Ita was elected the leader and the zone was active again.

9           THE COURT:  Ms. Rattan?

10          MS. RATTAN:  It wasn't disbanded.  It was active,

11  and this Defendant was the leader until early 2021.

12          It's not just one codefendant who says that.

13  There are three codefendants who provide corroborating

14  information that this Defendant was the leader -- the zonal

15  head leader of Black Axe through April of 2021.

16          THE COURT:  I'm going to overrule the objection.

17  Based on a preponderance of the evidence of what we have

18  here, I believe that's correct.

19          Your next objection, which is your Objection

20  Number 2 probably, the way it's worded by Probation.

21          MR. HOPPING:  It's my -- I'm sorry.  Which

22  objection?

23          THE COURT:  It's the objection indicating that he

24  stated he pleaded guilty to one count of wire fraud related

25  to romance fraud scheme.  He argued there was no Indictment

1    or previous charge which alleged his involvement in

2    unlicensed foreign currency exchange, unemployment fraud,

3    and/or insurance fraud.  Thus, the Defendant argued any

4    fraudulent activity outside of the romance fraud is not

5    relevant conduct to the instant offense.

6              MR. HOPPING:  So I believe we'll address that once

7    we come to the specific offense characteristics, the

8    objections to that.  That's just a clarification to the

9    factual assertion in the PSR that states as a matter of

10   fact that he conspired -- he facilitated, directed, and

11   participated in these activities.  So he's pled guilty to

12   the wire fraud --

13             THE COURT:  Well, I'm going to address it here so

14   we can -- this is where you first raise the issue.

15             MR. HOPPING:  Okay.  I can address it --

16             THE COURT:  I mean, of course --

17             MR. HOPPING:  You know, I can address the --

18             THE COURT:  And I'll just tell you, Mr. Hopping, I

19   mean, I sat through this trial.  This scheme was more than

20   just a romance scheme.  Was that the major part of it?

21   Most definitely it was.  But they had multiple schemes

22   going on, so -- so without a doubt -- I sat through this

23   trial -- this is all relevant conduct.

24             But you can make whatever argument you want to

25   make.  It's not a winning argument.

1           MR. HOPPING:  Well, I think, your Honor, you have

2    to look and define relevant conduct as to the Defendant,

3    not to the scheme as a whole.  And clearly if you look at

4    relevant conduct under Subsection (a)(1), the conduct --

5    the Defendant's conduct has to be either in preparation,

6    evasion, or related to the criminal activity.

7           So, you know, we've addressed whether -- there is

8    an allegation that he was involved in unemployment fraud,

9    which is related to two items in the discovery.  One is a

10   photograph of four numbers and some amounts and, as I've

11   stated in my objections, that this is proof of nothing.

12          The PSR categorically states this is related to

13   unemployment fraud, but there's been no nexus between the

14   photograph and unemployment fraud.  When, where, how,

15   amounts, there's been nothing.

16          And I couldn't even make an argument as to why it

17   would relate whether -- under (a)(2) whether there's common

18   accomplices, common scheme or plan, temporal proximity,

19   same *modus operandi*.

20          And you have to look at his conduct, not the

21   conduct of the conspiracy as a whole.

22          So without a photograph fulfills none of that.

23   There is a co-conspirator statement, as in the PSR, that

24   says he was involved in unemployment fraud, a conclusory

25   statement, again, with no substantiating details -- when,

 1   how, why, where.  Because if this unemployment fraud --

 2   alleged unemployment fraud -- let's take the statement as

 3   true.  If this happened in 2015, it's not relevant conduct

 4   because it's outside the term and scope of the conspiracy

 5   which is dated of 2017.

 6            So without any specifying details about the

 7   criminal conduct, then it can't be relevant conduct.  The

 8   Court would have to make inferences as to what the conduct

 9   was, when the conduct occurred, how the conduct occurred,

10   and how it was relevant conduct under (a)(2).  And you just

11   can't get there without making this leap.

12            So we would argue -- and most of the specific

13   offense enhancements in this case are based on this.

14   They're not based on his conduct in the conspiracy, what

15   he's pled guilty to, which is participating in the romance

16   fraud; they're based on this relevant conduct.  And there's

17   no proof.  There's no nexus.

18            The other allegation is the unlicensed money

19   transmission, which is based on text messages.  There's no

20   other substantiating details relating to the same how,

21   when, where, why that relate to these.

22            Furthermore, we provided his agent agreement that

23   he was licensed to transmit money.  So that, by default,

24   can't be the operation of a money -- unlicensed money

25   transmission business if he has a license to do it, so that

1  can't be relevant conduct.

2          So those are the two items that we go through the

3  analysis first to determine what's relevant conduct here.

4  And just because the conspiracy as a whole involved all of

5  these doesn't mean the Defendant did.  And if -- there's no

6  proof that qualified as relevant conduct.

7          THE COURT:  Response from the Government?

8          MS. RATTAN:  Well, the probation officer

9  identifying this as relevant conduct isn't really driving

10  the numbers in the sentence or in the guidelines, but, even

11  given that, the probation officer appropriately includes

12  it.  1B1.3 talks about offense conduct and relevant

13  conduct.

14          What you have is the Defendant has admitted that

15  he was a zonal head for a criminal organization, Black Axe.

16  He disputes the time period when he was the zonal head, but

17  he admits that he was the zonal head.  And the zonal head

18  of Black Axe oversees all types of fraud.  We see

19  $1.3 million of unexplained income/money going into his

20  account that the probation officer identifies.

21          So you've got romance fraud, you've got

22  unemployment fraud, you've got multiple types of fraud that

23  he's involved with.

24          And in terms of the unemployment fraud, you've got

25  a co-conspirator who says he was involved in unemployment

     1   fraud, and it's corroborated by what law enforcement finds

     2   on his phone.  They find on his phone six -- a photo of six

     3   unemployment benefit cards.  Well, what that means is these

     4   are cards for unemployment in different people's names, not

     5   his.  So that corroborates what the cooperator says, and

     6   the fact that he's the zonal -- admitted, confessed zonal

     7   head to a criminal organization supports this relevant

     8   conduct under 1B1.3.

     9        THE COURT:  Well --

    10        MR. HOPPING:  May I just respond briefly?

    11        THE COURT:  Yes.

    12        MR. HOPPING:  The photograph on his phone was not

    13   of unemployment benefit cards.  It was of numbers written

    14   on a piece of paper, and there were four-digit numbers and

    15   an amount.  And unemployment benefit numbers in Texas are

    16   nine-digit numbers.

    17        THE COURT:  Okay.  Well, I'm still going to

    18   overrule the objection.  I'll incorporate and adopt the

    19   probation officer's response.  I agree at least right there

    20   it doesn't impact, you know, the guideline calculation, but

    21   I do -- based on a preponderance of the evidence, there is

    22   enough for that to be, in my view, relevant conduct.

    23        Okay.  Your next objection is regarding the text

    24   message.

    25        MR. HOPPING:  So initially in the PSR, there was a

Sentencing Hearing                                              12

 1  text that was incorrectly identified in the initial PSR

 2  saying Musa sent Sandra Iribhogbe -- I hope I'm pronouncing

 3  her name correctly -- discussing --

 4          THE COURT:  Better than me, so yes.

 5          MR. HOPPING:  Is it Iribhogbe?

 6          THE COURT:  You are pronouncing it better than I

 7  do, so yes, go ahead.

 8          MR. HOPPING:  Okay.  It says, "dating girlfriend

 9  in love like $35,000 -- K, 20,000 -- 20 percent on 35k is

10  7,000."

11          So, again, a text message.  There is no allegation

12  that -- well, first of all, let me point out that this

13  message -- which in the final PSR corrects that Iribhogbe

14  sent Musa this message and --

15          THE COURT:  So what's left of your objection?

16          MR. HOPPING:  Well, I guess the thing -- my point

17  is that, again, this is a conclusory statement, a text

18  message.  There is no substantiation.  You know, all his

19  bank accounts, his bank statements, there's no

20  information -- corroborating information that this actually

21  took place, that this was an act of fraud.  And just

22  relying on a text message that's unsupported,

23  uncorroborated -- and let me be clear.  The Defendant did

24  not engage in any romance fraud transactions with Sandra

25  Iribhogbe.

1          So, you know, our argument would be, one, a text

2   message does not meet the preponderance of the evidence

3   standard if it's uncorroborated and there is no other

4   details regarding the transaction.

5          Number 2, it doesn't bear a sufficient indicia of

6   reliability to be relied on by the Court.

7          THE COURT:  Response?

8          MS. RATTAN:  Well, as the probation officer points

9   out, it's not just what Sandra Iribhogbe said when she

10  texted him, it's the fact that he didn't ignore the text,

11  he responded.  And he responded by saying, "But can we pay

12  35k at a go into the account?"  He's negotiating with her.

13  He's working with her.  He's responding, so it's

14  appropriately considered.

15         Additionally, there is a codefendant who provided

16  information that the Defendant used his business account to

17  do romance -- transfer romance money for Sandra Iribhogbe.

18         THE COURT:  I agree, and I will overrule this

19  objection and incorporate and adopt the probation officer's

20  response as well as the Government's.

21         Your next objection is 4 regarding the total loss

22  of JSK.

23         MR. HOPPING:  Yes, your Honor.  So for JSK, the

24  PSR estimates a loss amount of approximately 300,000.

25  However, when there is an actual loss amount, the Court

 1   must use that, which is 285,494.

 2          Second, there is a bright-line rule that states

 3   relevant conduct -- you can't be responsible for relevant

 4   conduct before you joined the conspiracy, which is the

 5   first transaction in February 17th of 2017, so all of the

 6   fraud that goes on before that can't be counted.  So, you

 7   know, the actual loss amount for JSK would be -- the total

 8   loss amount would be $177,892.

 9          So with the second transaction, SH, there's no

10   details, no transaction dates.  You know, therefore, there

11   is no ability to assess whether this was inside or outside

12   the scope of the conspiracy as it relates to the Defendant.

13   Therefore, out of the abundance of caution, I would urge

14   the Court to adopt the loss amount of $25,000, which is the

15   transaction amount the Defendant was responsible for, which

16   would make his total loss amount 202,892, which would

17   result in a two-level reduction in the loss amount.

18          Now, I will agree that the unemployment fraud and

19   the romance -- or the unemployment fraud and the unlicensed

20   money transmission was not used to increase his loss

21   amount, but it was used as a basis for -- to increase his

22   sentence based on other specific offense characteristics.

23          THE COURT:  Government's response?

24          MS. RATTAN:  Well, the probation officer has been

25   very, very conservative in determining a loss amount here.

 1   There was an inventory that was done by a forensic

 2   accountant of the Defendant's bank accounts during the time

 3   frame of the conspiracy, which was January of 2017 up

 4   through the date of the Information, which was February

 5   of 2024, I believe.  And that inventory of the Defendant's

 6   bank accounts showed $1.3 million in unexplained inflows,

 7   and that would be cash and Zelle inflows into the

 8   Defendant's account.

 9         That's not what he's being held responsible for.

10   The probation officer very conservatively is looking at the

11   victim loss amounts, and those are in paragraph 22 on

12   page 8 of the presentence report.  And the Defendant is

13   saying, oh, no, no, no, no.  You can't look at all the

14   money that the victim paid into the organization.  You just

15   have to look at that one small amount that came in to me.

16         But the probation officer notes that all seven of

17   the transfers are very similar.  They are all sent by WP,

18   and they are all sent from the same victim, and the time

19   period is very close in time.  So they are appropriately

20   conservatively considered.

21         THE COURT:  Again, I agree.  I'm going to overrule

22   this objection based on a preponderance of the evidence,

23   and I will incorporate and adopt the probation officer's

24   response.

25         Next objection, Objection 5.  This is regarding

1    the Black Axe membership dues.

2              MR. HOPPING:  Is it the victim enhancement?

3              THE COURT:  No.

4              MS. RATTAN:  This is where the Defendant says that

5    he didn't, as the zonal head, receive percentages --

6              THE COURT:  Right.

7              MS. RATTAN:  -- of the organization.

8              MR. HOPPING:  Oh, okay.

9              THE COURT:  It doesn't impact the guidelines at

10   all, but I just -- it's not a part of the guideline

11   calculation.

12             MR. HOPPING:  Okay.

13             THE COURT:  It's just an issue -- it doesn't cite

14   what paragraph this goes to, but it's the issue about

15   whether he received dues money from the Black Axe.

16             MR. HOPPING:  You know, I guess -- and we can

17   address this when we address the leadership role, you know,

18   if you want to defer it to that time and we can address it

19   in one lump.

20             THE COURT:  That's fine.

21             Ms. Rattan, do you have any problem with that?

22             MS. RATTAN:  No, your Honor.

23             THE COURT:  Okay.  The next two objections

24   Probation has grouped together, which is again part of the

25   same relevant conduct.  I think we've already dealt with

Sentencing Hearing

1    it, but I'll make sure there is nothing we're missing that

2    we didn't discuss earlier.

3              MR. HOPPING:  Is that as to --

4              THE COURT:  This is -- you are reasserting the

5    relevant conduct objection in Objection 2.

6              MR. HOPPING:  Yes.  I believe that's been

7    addressed.

8              THE COURT:  So that's -- and I will incorporate

9    the same response from Probation as before.

10             The next objection, which is Objection 8, is -- is

11   that the same victim as before?

12             MS. RATTAN:  No, it's not.  It's a separate

13   victim.

14             THE COURT:  Okay.  This is dealing with a

15   different victim regarding the amount.

16             MR. HOPPING:  Where are we at?

17             MS. RATTAN:  That's Objection 8.

18             (Off-the-record discussion among counsel.)

19             MR. HOPPING:  Yeah.  I mean, as previously stated,

20   we would, you know, argue that, you know, the same argument

21   would apply to, you know, that without supporting details

22   regarding the timing of the money.

23             I mean, the Court -- the Court has been pretty

24   clear that anything before is not part of the conspiracy,

25   anything after may be considered relevant conduct.  So

Sentencing Hearing

```
1    without dates and transactions, you know, it's impossible

2    to determine whether the entire amount would be considered

3    relevant conduct.

4            THE COURT:  Government's response?

5            MS. RATTAN:  Again, the probation officer's

6    calculation of the loss amount is very conservative.  And

7    certainly SH was a victim in this case, and paragraph 23

8    sets out very carefully the loss amount related to victim

9    SH.  And the information that the victim provided was

10   detailed.  She gave account information.  She gave a budget

11   sheet, bank account receipts on money that she sent.

12           And she thought, of course, that she was sending

13   it to Curtis Allan Duncan to try to help him, but, in fact,

14   a portion of it was going into the Defendant's bank

15   account.  And Probation holds the Defendant responsible for

16   the same reason.  It's the same victim, the same time

17   period, the same scheme for the entire amount that SH sent

18   in.

19           THE COURT:  I agree, and I'll overrule the

20   objection and incorporate and adopt the probation officer's

21   response.  Based on a preponderance of the evidence, that

22   is sufficient.

23           The next objection goes to a two-level enhancement

24   under 2B1.1(b)(2)(A) regarding the number of victims.

25           MR. HOPPING:  So, your Honor, here we have --
```

1    there's two transactions, and even if you take everything

2    in the PSR -- the presentence report as true, there's five

3    unemployment account numbers -- or five numbers -- or

4    alleged unemployment account numbers, which is seven.  If

5    we throw society as a whole in as a victim, that's eight.

6    It's less than ten.

7          The case has been very clear that victims -- the

8    Court can't estimate victims.  The victims have to be

9    identifiable, and they have to be clearly identifiable.

10   And here, the number is eight, assuming everything in the

11   PSR is true.  There's no other identifiable victims in the

12   PSR.

13         THE COURT:  Government's response?

14         MS. RATTAN:  I, of course, don't think the Court,

15   especially in this case, is limited to the exact

16   information that's included in the Defendant's PSR.  There

17   is a broad amount of information that the Court is aware of

18   from the trial alone, and certainly multiple victims

19   testified at the trial.

20         We know that the Defendant was the zonal head of a

21   criminal organization for four years.  We've got

22   $1.3 million of unexplained inflow going into his account.

23   We've identified two specific victims that had money going

24   into his account.  Certainly it's appropriate to apply this

25   enhancement here.

Sentencing Hearing    20

```
1         THE COURT:  I agree, and I will overrule the

2    objection and incorporate and adopt the probation officer's

3    response.  And, again, I think as I mentioned earlier, I

4    sat through this trial, and it is certainly reasonably

5    foreseeable for this defendant to be held responsible for

6    more than ten victims.

7         The next objection is Objection 10 for the

8    two-point enhancement under 2B1.1(b)(10).

9         MR. HOPPING:  Here, the PSR relies on the

10   operation -- or the allegation that he operated an

11   unlicensed money transmission business.

12        As stated previously, he had a license.  He wasn't

13   operating a money -- unlawful money transmission

14   business -- or unlicensed money transmission business.

15   Therefore, the basis of him, you know, transmitting money

16   overseas, he was licensed to do it.

17        And the only evidence they have that he did it are

18   some text messages that -- some ambiguous text messages

19   from Sandra Iribhogbe that say, "China 10k."  There's a

20   couple of text messages about exchange rates for the naira.

21   There's one text message stating about exchanging money or

22   delivering money to an account.

23        Again, these text messages do not -- are not

24   raised to the level of preponderance of the evidence, nor

25   do they bear a sufficient indicia of reliability.  There is
```

1   no corroborating information about the context of these

2   text messages; how, when, where, why did these transactions

3   take place; did they not take place, you know.

4            And, you know, I guess lastly, he is licensed to

5   do it.  I mean, he was in the business of helping people

6   wire money legitimately.  That's why he received a license.

7   It's not something that he was trying to hide or he was --

8   you know, he went out.  He got a license.  He signed an

9   agent agreement to do this.

10           THE COURT:  Government's response?

11           MS. RATTAN:  Well, the Defendant received a

12  plus-two enhancement under 2B1.1, and that's what he's

13  objecting to.  And that enhancement applies in one of three

14  ways:

15           The Defendant relocated or participated in

16  relocating a fraudulent scheme to another jurisdiction to

17  evade law enforcement or regulatory officials.  The Court

18  has heard the evidence, and certainly the organization did

19  that and, as we know, he was a leader in the organization.

20           Or, second, a substantial part of the fraudulent

21  scheme was committed from outside the United States.  And

22  certainly the Court knows from the evidence presented at

23  trial that Nigeria and China were significantly involved in

24  the criminal scene.

25           And, finally, that the offense otherwise involved

 1  sophisticated means and the Defendant intentionally engaged

 2  or caused the conduct constituting the sophisticated means.

 3       So any one of those three would result in a

 4  plus-two, and certainly based on the evidence in this case,

 5  the Defendant did at least one of those.

 6       THE COURT:  I agree, and I'm going to overrule the

 7  objection based on a preponderance of the evidence and

 8  incorporate and adopt the probation officer's response.

 9       The next objection is Objection 10 to the

10  two-point enhancement under 2B1.1(b)(11).

11       MR. HOPPING:  So in this enhancement, the PSR

12  relies on the fact that -- the use of device-making

13  equipment.  In support for this, again, they have alleged

14  that -- his participation in unemployment fraud.  However,

15  again, this enhancement fails because there is absolutely

16  no evidence that he used device-making equipment.

17       The PSR generalizes that in general these types of

18  frauds are participated -- or perpetrated by the use of

19  device-making equipment.  Certainly that does not rise to

20  the level, nor does it bear a sufficient indicia of

21  reliability to have the Court make an assumption or an

22  inference that -- without any specific details at all

23  regarding his alleged unemployment fraud -- that this

24  enhancement would be applicable.

25       And, furthermore, even if the general -- if it was

Sentencing Hearing                                              23

1    applicable under the general conspiracy, it has to be

2    applicable as to him, did he do it, was it relevant conduct

3    as to him.  And there's no evidence in the PSR that it is.

4           THE COURT:  Response?

5           MS. RATTAN:  I think the probation officer has

6    appropriately applied it here under 2B1.1(b)(11).  And as

7    the probation officer points out again, in the Defendant's

8    phone there was a photograph of six unemployment benefit

9    card numbers, and it totaled over $11,000.

10          And then there is a cooperating codefendant who

11   said that, in fact, the Defendant was involved in

12   unemployment fraud.  You don't have involvement in

13   unemployment fraud without participating in the activities

14   that are identified in (b)(11) under 2B1.1.

15          THE COURT:  The Court agrees.  I'm going to

16   overrule the objection and incorporate and adopt the

17   probation officer's response as well as the Government's.

18          The next objection is Objection 12 regarding the

19   vulnerable victim, which is under 3A1.1(b)(1),

20   paragraph 38.

21          MR. HOPPING:  So, in response to this objection,

22   the Defendant gave his bank account information to a

23   co-conspirator who then provided that information to the

24   victim.  Both instances, the facts are the same.

25          The PSR states that a co-conspirator sent a

1  message to another co-conspirator -- not Defendant, not

2  Mr. Musa, but between themselves -- that this victim was

3  dull.  And in support of that assertion that they -- I

4  assume "dull" means, you know, not smart or not sharp

5  instead of lacking interest, which I would assume would be

6  the ordinary definition.

7          But the Defendant had no knowledge -- this

8  information was not transmitted to the Defendant.  This

9  objection -- the Defendant has to have knowledge, knew or

10 should have known that this individual was dull.

11         Second, in reliance of that, they say that, well,

12 as evidence that this victim was dull was the fact that

13 they refused to believe that this was a -- that she was

14 defrauded, which is not -- I would assume not evidence that

15 an individual is dull.  I think the smarter you are, the

16 harder to believe that you would be able to fall or be

17 defrauded.

18         That, in itself, does not establish the fact that

19 someone -- you know, even if you assume the Defendant knew

20 or should have known that somebody was dull, that, in

21 itself, does not provide evidence that the victim was, in

22 fact, a vulnerable victim.

23         The second point that they rely on as -- that the

24 victim was vulnerable was the text message sent by Sandra

25 Iribhogbe to the Defendant, "dating girl in love."  Here,

1    the PSR makes a assumption, I would assume, that a girl in

2    love is vulnerable.

3          First of all, this enhancement applies to

4    immutable characteristics of a person -- right? -- age,

5    mental capacity.  Love is a transient emotion.  I mean, you

6    can't base an enhancement on a transient emotion of

7    somebody, of an individual.  Being in love does not make

8    somebody vulnerable ordinarily.

9          If the Court looks at the only immutable

10   characteristics, which would be "girl."  Is a girl in love,

11   you know, automatically vulnerable?  Because that's the

12   only immutable characteristic in that statement.

13         And then, lastly, again there is an allegation

14   that the unemployment fraud that everyone -- that the

15   Defendant engaged in unemployment fraud and generally that

16   these people are vulnerable.  But there is a lot of ways to

17   conduct unemployment fraud.  Unfortunately, we don't have

18   any evidence or details about how they allege the Defendant

19   did it but financial situation.  Being unemployed is not an

20   immutable characteristic.  It is a transient condition of

21   financial status.

22         THE COURT:  Response?

23         MS. RATTAN:  Well, the crux of the whole romance

24   fraud scheme, what they are doing globally, is they are

25   trying to find vulnerable people because people who aren't

```
 1   vulnerable aren't going to participate in this scheme.

 2          And as the probation officer points out, they

 3   found somebody who thinks they are in love.  And that's

 4   what the co-conspirators, the codefendants are trying to

 5   do, make these victims think that somebody loves them and

 6   then play on that vulnerability, and that's exactly what

 7   happened here.

 8          And certainly the Defendant knew because Sandra

 9   Iribhogbe is saying "dating girlfriend in love like 35k."

10   They are playing on the emotional vulnerability of someone

11   who they have romanced and manipulated, and he knows that.

12          THE COURT:  Ms. Rattan, I agree with the way you

13   explained that.  Now, the question is is that enough for

14   the enhancement, just -- because that would be true in

15   every, you know, kind of romance scheme, and typically we

16   see something more detailed.

17          So I'm going to overrule the objection.  I'm being

18   candid, though, I think this one is closer.  So I will

19   incorporate the probation officer's response and I'll

20   overrule the objection, but I just want to note that I

21   think this one is close.

22          MS. RATTAN:  Well, and I think the officer also

23   points out SH is, in fact, over 80 years old at the time.

24   And although it doesn't go specifically to this defendant,

25   the co-conspirators, the codefendants, are talking about
```

1   her not being bright.

2          THE COURT:  And that may be sufficient to cross

3   the line.  I'm just saying is -- I'm overruling the

4   objection.  I'm just being open to and candid about it.

5          And then I think one more, which also loops back

6   in Objection 5 and Objection 13 on the leader enhancement,

7   which is paragraph 39.

8          MR. HOPPING:  So, first of all, this goes -- this

9   objection goes to the overall narrative that is presented

10  here that the Defendant was a leader of the Black Axe, he

11  was a zonal head, which we concede.

12         However, the fact that this automatically

13  translates to him being a leader in this conspiracy --

14         THE COURT:  Can you use the mic?

15         MR. HOPPING:  Oh, sorry.

16         -- is a logical fallacy.  You can't automatically

17  attribute being a zonal head of the Neo Black Movement or

18  Black Axe to being a leader in the conspiracy without

19  something else, so the premise that the two automatically

20  equate is flawed.

21         Number 1, there's one other member of the Neo

22  Black Movement in this conspiracy, and that's Kingsley Ita.

23  So the Court would have to assume that being the leader of

24  the Neo Black Movement, which we have a letter that's

25  stating he resigned -- he sent an email resigning his

Sentencing Hearing                                    28

1    involvement.  In fact, after he sent that email in 2017, he

2    was blacklisted from the organization and he was

3    ostracized.  This did not go well with the leadership.

4    He's ostracized from the organization in '17.  That makes

5    his involvement or him being a zonal head during that time

6    nine months into the conspiracy that's four years.  So he's

7    a zonal head.

8            Second is that -- and we'll address the dues, but

9    they're -- that during -- we've provided meeting minutes

10   in, I think, Exhibit C.  These members paid $20 a month.

11   Now, the PSR states "of legitimate or illegitimate funds."

12   You know, the Defendant has no way of knowing whether

13   somebody pays their $20 a month with illegitimate funds.

14   So the overall theory of the Government's case and the

15   overall "house of cards" that's constructed in the PSR,

16   that because he's a leader of the Black Axe, he's guilty,

17   guilty, guilty, he owns it all.  And it's not true.

18           There is no evidence in the PSR that he was a

19   leader, he exercised control, that he recruited members.

20   Nothing.

21           That he exercised control, supervised members.

22   Nothing.

23           In fact, let's look at what we do know.  The

24   Defendant, who is in charge of everything, said, "Hey, I'm

25   getting a cut because I'm in charge.  I'm in control.  But

Sentencing Hearing                                              29

```
 1    I'm going to give my banking information -- my name, my
 2    company information, my banking information, to a
 3    co-conspirator so they can give that to a person for
 4    $2,500."  He did that twice, one in '17, one time in '20.
 5    Does that sound like somebody who is a leader, that's
 6    somebody in control of the whole conspiracy, that's
 7    somebody that's getting millions of dollars from these
 8    transactions?  No.  Of course it doesn't.  What leader
 9    would voluntarily give their information -- banking
10    information to get $2,500 in a fraud?
11         When the Defendant was arrested in this case, he
12    was broke.  He had civil lawsuits from vendors that had
13    been -- that had -- you know, that had nonpayment for
14    several years before that.
15         As to this million dollars -- your Honor, I can
16    add.  If you go through all of the bank statements during
17    this whole relevant time, the total amount of deposits is
18    $1.3 million, the total.
19         And he had a business.  This business was licensed
20    by the Homeland Security.  Homeland Security, pursuant to
21    his indirect air carrier freight license, audited his bank
22    accounts every month.  Two agents would come in every
23    month, and they would do a substantive audit, and they
24    would look at his bills of lading, his manifests, and his
25    bank accounts, and they would audit it every month during
```

1  this time period.  He got his license in 2012, and he had

2  his license until his arrest in this case, 2022.

3         So $1.3 million is the total amount of deposits in

4  his bank account over this period.

5         Second, it accounts for no expenses, none.  He had

6  expenses of $1.5 million, which is why he's getting $2,500

7  for a romance fraud by giving his information.

8         Secondly, he's the leader.  He's in charge.

9  There's a text message exchange with Egbe Isabor (phonetic

10 spelling) where they are negotiating about the cut and he

11 says, "I thought" -- in essence, "I thought I was getting

12 15 percent."

13        And Egbe was like, "No.  You're getting

14 10 percent.  I'm getting 15 percent."

15        And they have a discussion, a dispute.  And guess

16 what.  The leader of the conspiracy, of everything, had to

17 take the lesser cut, had to take the 10 percent.  That does

18 not illustrate that he had control of anything.  If he had

19 control, if he could exercise control, he would be getting

20 the 15 percent.  But he gets the 10 percent.

21        I sat through the detention hearings in this case.

22 There were defendants with Bentleys, houses, money in the

23 bank.  If he had $1.3 million, where is the money?  He has

24 nothing.  He had nothing.  He had to get a loan from a

25 codefendant, which is in that text message, Egbe Isabor, to

 1   help send money to Nigeria.  And they're using some of that

 2   money that he's getting to pay him back.

 3          Does a leader have to go to a member to get a

 4   loan?  I don't think so.  It doesn't add up.  The objective

 5   evidence in the PSR is a different -- is vastly different

 6   than the narrative.

 7          You can say all you want during that nine months

 8   that he was a leader and a zonal head.  There is absolutely

 9   no evidence that he exercised control, that he recruited

10   members.  There is a four-year investigation.  There's

11   wiretaps, video surveillance.  There's a mountain of

12   evidence in this case, but there's no evidence that he

13   exercised a leadership role.

14          You can be a member of the Black Axe and not be a

15   criminal.  You can be the leader of the Black Axe and not

16   be a criminal.  It's not a crime to be a member of the

17   Black Axe.  It's not a crime to be the leader of the Black

18   Axe.

19          THE COURT:  Response?

20          MS. RATTAN:  Well, what the Black Axe was doing

21   was fraud, and that part of it was criminal.  And the

22   Defendant takes issue with getting a leadership role when

23   he's admitted that he was a leader of the Black Axe, he was

24   a zonal head of the Black Axe.

25          And if you just look at the text messages -- and

1    we all know who Sandra Iribhogbe is.  The Court knows,

2    through the trial, what Sandra Iribhogbe and her husband

3    Edgal were all about.  They were about fraud.

4           And Sandra Iribhogbe, when she texts him, uses the

5    term "boss," as the probation officer points out in

6    paragraph 17 of the PSR.  She calls him boss.  They have a

7    lot of her text messages.  They were up on her wire.  Who

8    did she call boss during that time period?  It was this

9    defendant.

10          And in paragraph 18, she addresses him as "boss"

11   and she says, in fact, "You know you are a big boss."

12          The other thing that the messages between Sandra

13   Iribhogbe and this defendant show is that Sandra Iribhogbe

14   was asking his permission to do things during the time

15   period of the conspiracy.

16          And you can't underestimate the forensic analysis

17   of his accounts.  There was $1.3 million coming into his

18   accounts that's unexplained inflow, cash and Zelle.  That's

19   an indication of a greater portion of the proceeds of the

20   crime that was going to this defendant.

21          THE COURT:  Okay.

22          MR. HOPPING:  May I add something --

23          THE COURT:  Yes.

24          MR. HOPPING:  -- one more thing?

25          Sandra Iribhogbe is a female.  The Black Axe is a

1   male-only organization.  So to insinuate that he somehow

2   was the zonal head of a male-only organization that she was

3   somehow a member of as a female is logistically -- or

4   logically inconsistent.

5          THE COURT:  No, I don't think -- those two things

6   don't necessarily mean -- cancel each other.  He can be a

7   leader of Black Axe and still be a leader with Sandra,

8   so --

9          I agree with -- Ms. Rattan sets it out very

10  nicely.  I'm going to overrule the objection and

11  incorporate the probation officer's response.  The PSR is

12  very detailed, and, of course, I sat through this trial.

13  And so the enhancement is properly applied, so I'll

14  overrule those objections.

15         I think those were all your objections.  Correct,

16  Mr. Hopping?

17         MR. HOPPING:  I believe so, your Honor.

18         THE COURT:  I think so, too.  We went through them

19  all, so I didn't think I missed any.

20         MR. HOPPING:  Unfortunately.

21         THE COURT:  Okay.  Sir, you pleaded guilty to

22  Count 1, conspiracy to commit wire fraud.  To the extent

23  the Court hadn't fully accepted the Plea Agreement, Court

24  will fully accept it now.

25         And so the Court finds the information contained

1    in the presentence report has sufficient indicia of

2    reliability to support its probable accuracy.  The Court

3    adopts the factual findings, undisputed facts, and the

4    guideline applications in the presentence report.

5             Based upon a preponderance of the evidence

6    presented and the facts in the report, while viewing the

7    sentencing guidelines as advisory, the Court concludes as

8    follows:  Your total offense level is a 28, your criminal

9    history category is a I, which provides for an advisory

10   guideline range of 78 months to 97 months of imprisonment.

11            Now, you have submitted -- well, there were

12   multiple versions of the memorandum -- of your Sentencing

13   Memorandum, which I've reviewed them all but I reviewed the

14   last one just today.

15            And then the Government, of course, filed a motion

16   for upward variance or upward departure as well.

17            Mr. Hopping, normally I would start with you

18   first, but I'm going to start with the Government first

19   because you're going to want to respond to their request to

20   go up.

21            MR. HOPPING:  Very well, your Honor.

22            MS. RATTAN:  Well, the Court sentenced the first

23   Defendant, Defendant Number 1 in the Indictment and in the

24   organization, Kingsley Ita, to 120 months, and that was on

25   an upward variance, and his guidelines were lower than what

Sentencing Hearing

```
1   this defendant's were.

2         The other thing we know about Kingsley Ita is that

3   he was also a zonal head over Black Axe, but his reign was

4   only for six months.  By contrast, this defendant's

5   guideline calculation is much higher than Kingsley Ita's,

6   and this defendant was the zonal head leader of the Black

7   Axe organization, under the evidence that we know of, for

8   four years.

9         So we would ask that the Court consider those

10  factors in determining where to upwardly depart and

11  sentence this defendant.

12        THE COURT:  And what is the -- does the Government

13  have an ask?

14        MS. RATTAN:  We think that 15 years would be

15  appropriate, your Honor.

16        THE COURT:  Okay.  Mr. Hopping, you probably have

17  a lot of things to say, and you can say whatever you want

18  to say, but also I assume you will respond to the

19  Government as well.

20        MR. HOPPING:  I will, your Honor.

21        So, you know, obviously, you know, Mr. Musa has

22  taken responsibility for his actions in this case.  He's

23  pled guilty.  You know, he has debriefed with the

24  Government, you know, and, you know, I think there are

25  certain factors under 3553 that make, you know, his -- that
```

1    the Court should consider.

2            First of all, you know, he's 54 years old.  You

3    know, he's had a series of health problems while he has

4    been incarcerated.  He has suffered bouts of temporary

5    blindness, which currently are undiagnosed.

6            I have included as an exhibit his request for

7    medical treatment at the Fannin County Detention Center

8    that detail his request to receive medical treatment.  He's

9    currently being housed in Okmulgee, a county facility,

10   where the marshals have approved him to see a specialist.

11   However, he has not yet seen a specialist.

12           So, you know, obviously at 54, you know, any

13   prison sentence that the Court would, you know, hand down

14   would be a significant sentence for him.

15           You know, his family support -- he has two

16   beautiful daughters that he loves.  One is getting ready to

17   graduate from high school.  This case -- he has not seen

18   his oldest daughter graduate from college, attend medical

19   school.  And his -- this loss of support while he's been in

20   jail is a significant factor to him.  He hasn't been able

21   to support his family, his daughters, emotionally,

22   financially through this very transitional period of their

23   life as they graduate from high school and move to college

24   and beyond.

25           And, you know, it should be noted that he's 54

Sentencing Hearing                                    37

 1   years old and has no criminal history.  He's never been in

 2   trouble before.  He's never been arrested before.  He had a

 3   Homeland Security license before this.

 4          So, you know, obviously age and criminal

 5   history -- you know, I've provided the studies for the

 6   Court.  But based on his age, criminal history points, his

 7   educational level, that, you know, his risk of recidivism

 8   is extremely low.  It is the lowest.  And also if you add

 9   to that, fraud offenses typically have a low recidivism

10   rate as opposed to, like, firearm offenses which have the

11   highest recidivism rates.

12          So, you know, I would argue that, you know, based

13   on his risk of recidivism, you know, is low, that the

14   Court -- that any sentence -- you know, he has a very low

15   risk of rearrest or recidivism.

16          You know, I've provided the Court -- obviously the

17   Government has pointed out that Kingsley Ita -- you know,

18   I'm not familiar with the facts of Mr. Ita's case,

19   unfortunately, so I can't respond to whether and what his

20   involvement was and what the evidence supporting his role

21   or leadership role in this, so I'm at a little bit of a

22   disadvantage there.  But I will say that the two defendants

23   that were involved in the two transactions the Defendant

24   was involved in received a 24-month and a 36-month

25   sentence.

Sentencing Hearing                    38

 1          David Animashaun was indicted in the Northern

 2   District and received a 24-month sentence.  He had direct

 3   contact with the victim, and he was ordered to pay a

 4   million dollars in restitution.

 5          Egbe Isabor received a 36-month sentence.  Again,

 6   he had direct contact with the victim.

 7          And, you know, lastly, I'd like to point out that,

 8   you know, I provided, you know, the case law, but the

 9   courts can absolutely consider collateral consequences when

10   assessing the Defendant's punishment.  Here, the Defendant

11   made a mistake and -- his mother was sick and he needed

12   money and he made an unfortunate decision, which he is

13   before this Court today taking responsibility for.  So that

14   decision cost him everything.

15          Since he's been incarcerated, he's been divorced,

16   he's lost his business, he's lost his business licenses,

17   he's lost his permanent residency, and he faces a

18   substantial risk to being deported after his incarceration

19   to Nigeria, which means he's going to be separated forever

20   from his family, from his daughters.  He's never going to

21   see his daughters grow up, unless they travel to Nigeria,

22   celebrate weddings, celebrate milestones in their life.

23   And to be honest with you, that is the biggest regret the

24   Defendant has.

25          Before this, he was a permanent resident, had his

Sentencing Hearing                    39

1   application for citizenship pending.  His wife had already

2   been granted citizenship.  He had a business that wasn't

3   thriving.  He was in trouble a little bit financially, but

4   he was home.  He was the father, head of his household.  He

5   loves his daughters.  He was providing support for his

6   daughters.

7          After this, he has nothing.  The only thing he has

8   to show for this case -- and arguably we have a different

9   position -- is $4,900 is what he got from these two

10  transactions.  This amorphous million dollars that he got

11  is the total amount -- again I'll reiterate -- of deposits

12  during these six years into his business accounts.  There's

13  no way that that can all be attributed to fraudulent

14  activities.  Plus, you've got to take out expenses.

15  There's been no allocation for expenses.  He operated at a

16  loss those years.  He had some good years; he had some bad

17  years.

18         So I would ask that the Court take into

19  consideration -- obviously, we're going to ask the Court to

20  deny the upward departure.  I don't think it's warranted in

21  this case based on the evidence, based on the lack of

22  evidence of his leadership role, based on the fact that he

23  resigned as a leader and a member of the Black Axe seven

24  months after the first transaction.

25         So we would ask the Court to take all of that into

Sentencing Hearing

1    consideration under 3553(a) and fashion a sentence that is

2    not greater than necessary to fulfill the sentencing

3    guidelines.  And I think in this case, based on those

4    factors, we would urge the Court to sentence him on the low

5    end or depart downward from the guidelines.

6          THE COURT:  Ms. Rattan, anything else you want to

7    add before I call upon the Defendant?

8          MS. RATTAN:  Yes.

9          For the Defense to say that what the Defendant did

10   in this case was a mistake is completely ignoring the

11   evidence, and it verges on failing to accept

12   responsibility.

13         And for the Defense to claim -- or ask the Court

14   to consider his age in mitigation of the crime that he

15   committed is a consummate irony because when you talk about

16   how old someone is, that's what this crime is kind of

17   about.

18         We saw multiple victims come.  They were elderly.

19   They were vulnerable because of their age.  And that's who

20   this organization was preying on, people who were older.

21   And yet he comes before the Court and says please mitigate

22   my sentence because I'm older.  That's a very rich irony.

23         The Defendant asks the Court to mitigate his

24   sentence, too, because of his health.  Certainly we don't

25   want anyone's health to be jeopardized, but we have medical

Sentencing Hearing                    41

1  facilities that can address those.

2          THE COURT:  Mr. Musa, you have the right to

3  address the Court prior to sentencing.  Now would be the

4  time if you wanted to say something.

5          THE DEFENDANT:  Yes, sir.  Yes, your Honor.

6          First and foremost, I would like to thank you for

7  these opportunity you give to me to say something.

8          I accept the responsibility of what I did.  I've

9  been in this country for over 16 years.  I've never

10 defaulted in everything I've done.  Even a speeding ticket

11 I don't have.

12         My company is licensed under the indirect air

13 carrier of the transportation and Homeland Security.  They

14 do checks on my business every month.  I've never

15 defaulted.  I've never gotten any ticket from them.

16         I was brought up in a very cordial and disciplined

17 home, and I've tried as much as possible to embrace that

18 fact so that I don't derail to go into things that are not

19 proper.  And if I ever see anything that is not proper

20 that's coming my way, I try to avoid it.  I've done all

21 this.

22         I understand the kind of country I am, that in

23 this country if you do what is not right, you will bear the

24 consequence.

25         And before I get to that stage of doing it, I have

Sentencing Hearing                                                42

 1   to back out.  I wouldn't want to go into the argument that
 2   has been done.  But all I'm saying is I'm very sorry for
 3   the part I played by getting involved in the two
 4   transactions that came to me.  I regret it, and I'm asking
 5   for a second chance that if I ever -- if I get out, I will
 6   never be a part of anything that is not proper.
 7            I was stupid, and I was selfish to have put my
 8   mom's case first for any other one, not considering that
 9   the money that is coming for me to do this treatment for my
10   mom was not good.  At times I do sit down at this stage and
11   ask myself maybe it's because I did something wrong, the
12   money I used in sending to treat my mom, that she even
13   died.
14            This whole process, one, it has cost me a lot of
15   physical and -- and emotional stress.  I can't explain how
16   deep and sorry I am for what has happened.
17            I am a law-abiding citizen.  I have a company, and
18   I have -- every year in my community where I stay here, my
19   company undertake a charity kind of donation to my area
20   where I stay in Richardson.  We provide meals, meals to
21   people that cannot afford.  Then we give school pack to
22   children going back to school.  I've tried as much as
23   possible to do what is right.
24            And a lot of accusation that has been leveled
25   against me are not right.  The one I did I accepted.  I'm

Sentencing Hearing                                          43

 1   not denying.  I went for a debriefing on this case, and I

 2   opened up to say this and this is what I'm involved with,

 3   this is what I have done.

 4           I'm asking for mercy, and I'm asking for a second

 5   chance.  Thank you, your Honor.

 6           THE COURT:  Thank you.

 7           Any reason why the Court should not pronounce

 8   sentence at this time?

 9           MS. RATTAN:  No, your Honor.

10           MR. HOPPING:  No, your Honor.

11           THE COURT:  So, first thing first, I am going to

12   grant the Government's motion for upward variance.

13           And then I also will indicate that, of course, the

14   Court has to do the guideline calculation and, Mr. Hopping,

15   you've raised a lot of objections.  But at the end of the

16   day, I have to figure out what's the right sentence for

17   each individual Defendant.  And in terms of this case, the

18   sentence I am about to impose is the sentence I would

19   impose even if I'm wrong on all of the objections because I

20   look at the activity and look at everything in the PSR and

21   look at this defendant and try to figure out what that

22   should be.

23           And this case -- of course, the Government points

24   out in their motion the issue about Black Axe and his

25   leadership role there.  But I also look at the idea of

 1   protecting society and what the victims went through and

 2   showing deterrence.

 3           And, you know, you indicate that, you know, there

 4   is a low chance of generally someone in financial crimes.

 5   Well, you know, these financial crimes cause a lot of harm

 6   to the victims, and, you know, I have to really concern --

 7   again, this idea of protecting the community.

 8           And then we have Mr. Musa here today in his

 9   allocution trying to minimize some of the things.  He

10   admits to some of it, but he tries to minimize the rest.

11           And so for all of those reasons, you know,

12   primarily because he is and was a leader of Black Axe, he

13   was involved in the leadership in this conspiracy, and in

14   protecting victims and society, I would grant an upward

15   variance anyways on my own.

16           Pursuant to the Sentencing Reform Act of 1984,

17   having considered the factors noted in 18 USC,

18   Section 3553(a), and having consulted the advisory

19   sentencing guidelines, it is the Judgment of the Court that

20   the Defendant is hereby committed to the custody of the

21   Bureau of Prisons to be imprisoned for 180 months on

22   Count 1 of the Information.

23           While incarcerated, it is recommended you

24   participate in the Inmate Financial Responsibility Program

25   in accordance with the requirements of the program.  If you

Sentencing Hearing                                                    45

1    participate in the program, you shall pay 50 percent of

2    your earnings per pay period to the outstanding monetary

3    penalties.

4           The determination of restitution is deferred for a

5    period of not to exceed 90 days from the date of this

6    Judgment.

7           The Court finds you don't have the ability to pay

8    a fine.  I'll waive the fine in this case.

9           It is ordered you will pay the United States a

10   special assessment of $100, which is due and payable

11   immediately.

12          Any monetary penalty that remains unpaid when your

13   supervision commences is to be paid on a monthly basis at a

14   rate of at least 10 percent of your gross income.  The

15   percentage of gross income to be paid with respect to any

16   restitution and/or fine is to be changed during your

17   supervision, if needed, based on your changed

18   circumstances, pursuant to 18 USC, Section 3664(k) and/or

19   18 USC, Section 3572(d)(3).

20          If you receive any inheritance, any settlements

21   (including divorce settlements and personal injury

22   settlements), gifts, tax refunds, bonuses, lawsuit awards,

23   and any other receipt of money (to include, but not limited

24   to, gambling proceeds, lottery winnings, and money found or

25   discovered), you must, within five days of receipt, apply

Sentencing Hearing

 1   100 percent of the value of such resources to any financial

 2   penalty ordered.

 3          None of the payment terms imposed by the Judgment

 4   preclude or prohibit the Government from enforcing the

 5   unpaid balance of the restitution or monetary penalties

 6   imposed herein.

 7          Upon release from imprisonment, you shall be

 8   placed on supervised release for a term of three years.

 9   Within 72 hours of release from the custody of the Bureau

10   of Prisons, you must report in person to the Probation

11   Office in the district where you are released.

12          You must not commit another federal, state, or

13   local crime and must comply with the standard conditions

14   that have been adopted by this Court in our General

15   Order 17-3.  In addition, you must comply with the

16   mandatory and special conditions and instructions that have

17   been provided to you and your counsel as part of the

18   presentence report prior to sentencing, which the Court

19   hereby adopts.

20          There was a Preliminary Order of Forfeiture and,

21   of course, I'll enter the Final Order of Forfeiture.

22          Mr. Hopping, did you go over our General

23   Order 17-3?

24          MR. HOPPING:  Yes, your Honor.

25          THE COURT:  Were there any objections to those?

Sentencing Hearing                                                          47

1           MR. HOPPING:  No, your Honor.

2           THE COURT:  And then I think he requested

3    California.  Is that still the place where he wants --

4           MR. HOPPING:  Yeah, I believe Dublin, California.

5           THE COURT:  Okay, Dublin, California.  I will go

6    ahead and put that in the Judgment as a recommendation.

7           Now, sir, you have the right to appeal your

8    conviction if you believe your guilty plea was somehow

9    unlawful or involuntary or if there was some other

10   fundamental defect in the proceedings that were not waived

11   by your guilty plea.

12          You have a statutory right to appeal your sentence

13   under certain circumstances, particularly if you believe

14   your sentence is contrary to law.  However, you can waive

15   some of those rights as part of this Plea Agreement, and

16   you have entered into a Plea Agreement which waives certain

17   rights to appeal your conviction and your sentence.

18          With the exception of the grounds reserved in your

19   Plea Agreement, you have waived any right to appeal in this

20   case.  Such waivers are generally enforceable, but if you

21   believe the waiver is not enforceable, you would need to

22   present that theory to the appellate court.  With few

23   exceptions, any Notice of Appeal must be filed within

24   14 days of the Judgment being entered in this case.

25          If you are unable to pay the cost of the appeal,

Sentencing Hearing                    48

1    you may apply for leave to appeal *in forma pauperis*, which

2    is without payment of fees.  And if you so request

3    assistance, the Clerk of the Court will prepare and file a

4    Notice of Appeal on your behalf.

5             Your presentence report is already part of the

6    record.  It's under seal.  It will remain under seal unless

7    needed for purposes of appeal.

8             And then are there charges to dismiss?

9             MS. RATTAN:  Yes, your Honor.  The Defendant pled

10   to an Information.  We would move to dismiss the

11   Indictment.

12            THE COURT:  Okay.  I'll grant that request.

13            And then anything further from the Government?

14            MS. RATTAN:  No, your Honor.

15            THE COURT:  Anything further from Defense?

16            MR. HOPPING:  No, your Honor.

17            THE COURT:  Okay.  Sir, you're going to go back

18   into custody of the marshals pending your placement, and

19   good luck, sir.

20            THE DEFENDANT:  Thank you.

21            (Proceedings concluded, 5:18 p.m.)

22   COURT REPORTER'S CERTIFICATION

23            I HEREBY CERTIFY THAT ON THIS DATE, MARCH 10,
     2025, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD
24   OF PROCEEDINGS.

25                    /s/_____
                      CHRISTINA L. BICKHAM, CRR, RDR